TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
POONAM G. KUMAR (Cal. Bar No. 270802)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0719
     Facsimile: (213) 894-6269
     E-mail:    poonam.kumar@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-273-ODW |
|---|---|
| Plaintiff, | <u>GOVERNMENT'S SENTENCING POSITION</u> |
| v. | Hearing Date: February 7, 2022 |
| MARY MARGARET KREUPER, | Location:      Courtroom of the<br>               Hon. Otis D. Wright |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Poonam G. Kumar, hereby files its Sentencing Position.

//

//

This Sentencing Position is based upon the attached memorandum of points and authorities, the declaration of AUSA Poonam G. Kumar and Exhibits A through P thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 24, 2022     Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

         /s/
POONAM G. KUMAR
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

I.   INTRODUCTION..................................................1

II.  STATEMENT OF FACTS............................................1

III. SENTENCING GUIDELINE CALCULATION .............................3

IV.  A SENTENCE OF 24 MONTHS OF IMPRISONMENT IS REASONABLE AND
     JUST..........................................................4

     A.   The Nature and Circumstances of Defendant's Crime........5

     B.   Defendant's History and Characteristics..................8

     C.   The Need to Reflect the Seriousness of the Crime,
          Promote Respect for the Law, Provide Just Punishment,
          Protect the Public from Further Crimes by Defendant,
          and Avoid Unwarranted Sentencing Disparities.............9

V.   RESTITUTION IS MANDATORY.....................................10

VI.  SUPERVISED RELEASE...........................................11

VII. CONCLUSION ..................................................12

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

Cases

United States v. Anderson,
    741 F.3d 938 (9th Cir. 2013) .................................... 10

United States v. Baker,
    584 Fed. Appx. 469 (9th Cir. 2014) ............................ 10

Federal Statutes

18 U.S.C. 3664(j)(1) ........................................... 11

18 U.S.C. § 3663A .............................................. 10

United States Sentencing Guidelines

U.S.S.G. § 2B1.1 ................................................ 4

U.S.S.G. § 2S1.1 ................................................ 4

U.S.S.G. § 3B1.3 ................................................ 4

U.S.S.G. § 3E1.1 ................................................ 4

U.S.S.G. § 3553 ................................................. 4

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

For ten years, Mary Margaret Kreuper ("defendant") stole over $800,000 from St. James Catholic School ("St. James"), the school of which she was the principal for nearly 30 years.  In doing so, she abused the position of trust placed in her by the St. James community.  With impunity, defendant stole money that was intended to further the students' education.  She stole the funds, concealed them in secret bank accounts, and then spent the funds on her lifestyle, specifically to travel and gamble.  In order to ensure her scheme went undetected, defendant lied on monthly and annual financial reports submitted to the school's administration.  And then, when an audit threatened to expose defendant's long-running scheme, defendant instructed St. James employees to destroy documents so her crimes would not be discovered.

A significant sentence is necessary in order to reflect the egregiousness of this offense, to provide just punishment, ensure defendant and other similarly situated defendants are sufficiently deterred, and avoid unwarranted sentencing disparities.  To address the goals of sentencing, the government respectfully requests that the Court impose a sentence of 24 months of imprisonment, a three-year term of supervised release, restitution in the amount of $825,338.57, and special assessments of $200.

**II.  STATEMENT OF FACTS**

For about 28 years, defendant, a nun and member of an order of nuns affiliated with the Catholic Church ("Order"), was the principal of St. James, an elementary school in Torrance, California.  (Plea Agreement, Ex. B; PSR ¶¶ 12-13.)  Because as a nun she had taken a

vow of poverty, the entirety of her principal salary was paid to the Order, which, in turn, was responsible for paying defendant's living expenses. (Plea Agreement, Ex. B; PSR ¶ 12.) As principal of St. James, defendant was responsible for overseeing and managing the financial affairs of the school, including safeguarding the school's finances. (Plea Agreement, Ex. B; PSR ¶ 3.) As principal and leader of the school, defendant was in a position of trust within the school and the entire St. James community.

Defendant abused that trust by stealing over $800,000 from the school. As parents of St. James' students paid their tuition and other school fees by cash and check, defendant would fraudulently divert some of those funds and deposit them into bank accounts of which the St. James administration was unaware. (Plea Agreement, Ex. B; PSR ¶ 17.) After depositing the funds and ensuring that their existence was concealed, defendant would use the funds to pay for expenses that the Order would not have approved, much less paid for, including large gambling expenses and trips to Las Vegas, Lake Tahoe, and Temecula. (Plea Agreement, Ex. B; PSR ¶ 17-18.)

It was defendant's responsibility to submit financial reports for the school to its administration. (Plea Agreement, Ex. B; PSR ¶ 19.) In order to further and conceal her scheme, defendant falsified these reports by omitting any reference to the funds she stole as well as the secret accounts into which she deposited the stolen funds. (Plea Agreement, Ex. B; PSR ¶ 19.) By doing so, defendant lulled the school and its administration into believing that she had properly safeguarded and accounted for the school's finances. (Plea Agreement, Ex. B; PSR ¶ 19.) After stealing the funds, defendant laundered the funds so as to conceal the source of

2

the money by writing checks to another individual that this individual would then cash for defendant. (Plea Agreement, Ex. B; PSR ¶ 21.) In total, defendant stole $835,338.57 in funds from the school in the span of a decade. (Plea Agreement, Ex. B; PSR ¶ 22.)

After defendant announced her retirement in 2018, the school announced the start of an audit to prepare for the transition. In order to further conceal her scheme, defendant directed two employees of the school to lie, destroy records, and delete documents. (Declaration of Poonam G. Kumar ("Kumar Decl."), Exs. A, B, C.) Ultimately, these employees went to the school's administration to report defendant's actions. (Id.) Following these allegations and the discovery of additional discrepancies, the school's administration launched a formal investigation. Defendant was interviewed on September 5, 2018 by the Archdiocese. In this interview, defendant admitted to stealing money from the school, but justified her actions based on her belief that priests were compensated better than nuns. (PSR ¶ 26; Kumar Exhibit Decl. Ex. D.) Defendant stated that her theft of funds was her way of raising her salary. (Id.) She stated that she used the funds to, among other things, "travel, eat[] out with friends" and gamble in Las Vegas, Lake Tahoe, and Temecula. (Id.) Defendant also stated that "she never considered what she was doing to be wrong" and that she continued to feel that way. (Id.)

**III. SENTENCING GUIDELINE CALCULATION**

In the plea agreement, the parties agreed to the base offense level and certain enhancements. (Plea Agreement ¶ 15.) The parties also agreed that defendant is entitled to a two-level variance as

3

recognition for her early acceptance of responsibility.  (Plea Agreement ¶ 17.)

Based on the plea agreement, the government submits that the appropriate Guideline calculation in this case is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | [U.S.S.G. § 2B1.1] |
| Specific Offense Characteristics: | | |
| Loss of More than $550,000 | +14 | [U.S.S.G. § 2B1.1(b)(1)(H)] |
| Conviction for § 1956 | +2 | [U.S.S.G. § 2S1.1(b)(2)(B)] |
| Abuse of Position of Trust | +2 | [U.S.S.G. § 3B1.3] |
| Acceptance of Responsibility | -3 | [U.S.S.G. § 3E1.1(a),(b)] |
| Variance in Plea Agreement | -2 | [U.S.S.G. § 3553(a)] |
| **Total Offense Level** | **20** | |

Beyond what the parties agreed to in the plea agreement, as set forth in greater detail below, the government is moving for a further three-level variance based on defendant's history and characteristics.  If granted, this would lower the total offense level to 18.  With a criminal history category of I (PSR ¶ 50), the resulting Guideline range is 24 to 30 months.

**IV.  A SENTENCE OF 24 MONTHS OF IMPRISONMENT IS REASONABLE AND JUST**

The record amply supports a sentence of 24 months of imprisonment.  Any lesser sentence would not sufficiently address the § 3553(a) factors, including, the nature and circumstances of defendant's crime, her history and characteristics, the need to reflect the seriousness of the crime, promote respect for the law, provide just punishment, and avoid unwarranted sentencing disparities.

**A.   The Nature and Circumstances of Defendant's Crime**

The offense in this case is undoubtedly serious.  The amount of money (over $800,000) embezzled is significant.  It is particularly significant when considered in relation to the source from which it was stolen:  an elementary school.  The annual tuition of the school in 2021 was $5,775.  Tuition and Fees, St. James Catholic School, available at https://www.sjscatholicschool.org/apps/pages/index.jsp?uREC_ID=677015&type=d&pREC_ID=1115792 (last visited January 18, 2022).  On an annualized basis (approximately $83,000 per year), defendant stole the equivalent of the tuition of 14 different students per year.  These funds were intended to further the students' education, not fund defendant's lifestyle.  In their letters, several students and parents commented on how the school was lacking in resources.  As one parent stated, "[t]he kids needed so many things.  We could not have organized sports teams unless a parent volunteered to be a coach.  We could have had a more successful school with the environment, school supplies, and learning materials."  (Kumar Decl. Ex. E.).  Another parent discussed how defendant said there was no money for an awning at school and no money for field trips.  (Kumar Decl. Ex. F.)  A student commented how defendant said that the school "could not afford anything extra, whether field trips, books newer than the twenty or third year old books we used . . ., or renovations to student facilities."  (Kumar Decl. Ex. G.)  While defendant may claim that there is no evidence that the school failed to embark on improvements because of budgetary constraints, that argument is misplaced.  As set forth on the school's website, tuition and fees are needed for, among other things, books, classroom supplies,

testing, health services, and capital improvements.  Tuition and Fees, St. James Catholic School, available at https://www.sjscatholicschool.org/apps/pages/index.jsp?uREC_ID=677015&type=d&pREC_ID=1115792 (last visited January 18, 2022).  Had the school's administration known that defendant was stealing as much as $83,000 per year, it could have chosen to use those funds to embark on new construction projects, purchase new supplies for the students, raise teacher salaries, or even lower tuition.  It could also have ceased asking the parents for additional donations above and beyond tuition.  (See Kumar Decl. Ex. E.)  By depriving the school and its students of these funds, defendant deprived the administration of the ability to make these decisions and as such, her actions unquestionably had a material impact on the students.

Further, defendant's scheme was methodical.  It was not an accident.  Rather, she took step after step to steal over $800,000.  Each time she stole a check, deposited into the secret bank accounts, withdrew the funds to spend them on herself, and then lied on annual reports, defendant was executing this scheme.  As one former student stated in a letter to this Court, defendant "made a calculated, deliberate choice over and over again to take money from thousands of children."  (Kumar Decl. Ex. H.)  This repetition and careful planning is aggravating.

Commission of the offense is rendered all the more serious because of the position of trust defendant occupied.  She was the principal of the school; she was a leader in the community.  She betrayed the trust placed in her by that community -- by the teachers who taught at the school, the parents who volunteered at the school, and the students who she saw every day.  This violation of trust

extends further in this case because the parents sought more than simply an academic education at St. James. St. James's mission is to "work to facilitate the development of confident, competent, and caring Catholic-Christian citizens prepared to be responsible members in service of their church, local, and global communities." Mission Statement, St. James Catholic School, available at https://www.sjscatholicschool.org/apps/pages/index.jsp?uREC_ID=668284&type=d&pREC_ID=1115754 (last visited January 28, 2022). Indeed, as one parent stated, many of the parents sent their children to Catholic school "because we wanted them to have a quality education along with the religious beliefs being reinforced with how we raised them at home." (Kumar Decl. Ex. F.) Another parent said she chose to send her children to the school so they would "become valuable members of society" and because she "thought the school and staff shared the same morals and values as we do." (Kumar Decl. Ex. E.) And yet another said that she sent her five children to St. James "so they could be molded into individuals of great character and instill the morals in them that were important to us." (Kumar Decl. Ex. P.) Defendant flagrantly violated and undermined the school's mission by stealing from the school. In so doing, defendant betrayed the morals and values that the school was founded on and that the administrators were tasked with imparting to the students.

  Defendant's conduct immediately preceding the discovery of her offense is also aggravating and necessitates a term of imprisonment. When faced with the possibility that her theft would be discovered, defendant tried to convince employees to destroy or delete records that may have revealed her offense. Defendant did not come forward and report her own crimes. Indeed, she did everything in her power

7

to avoid getting caught.  Even when confronted with her theft, defendant did not express remorse and justified her theft based on a purported pay disparity between priests and nuns.  This excuse rings hollow since defendant had taken a vow of poverty and the entirety of her salary was to be paid to the order.

In mitigation, defendant did admit to her theft when confronted by the Archdiocese.  Since the involvement of law enforcement, she has consistently and repeatedly expressed her desire to take responsibility for her crimes.  She followed through on this by pleading guilty pre-indictment in this matter and waiving her appellate rights.  This extraordinary acceptance of responsibility underpins the two-level variance the parties agreed to in the plea agreement.

**B.   Defendant's History and Characteristics**

Defendant's history and characteristics merit consideration here and are the principal factors underlying the government's request for an additional three-level variance.  In particular, defendant's age and lack of criminal history are mitigating factors.  These factors lessen defendant's risk of recidivism and thus, the need for specific deterrence.  However, this risk is not entirely eliminated.  It is worth noting that defendant committed the instant offense while in her 60s and 70s and thus, age was not an entirely sufficient deterrent for defendant previously.  Defendant also has no criminal history and thus, this will be the first time defendant spends any time in prison.  Given these factors, the government believes a further variance of three levels – beyond the two-level variance the parties have already agreed to in the plea agreement – is appropriate.

The government is not persuaded that defendant's purported gambling addiction merits any further variance. While defendant did spend money at casinos, that was not the only place defendant spent funds. Furthermore, defendant did not go gambling every day or even every week- behavior that would indicate some sort of compulsion. Rather, she went on vacations with friends and during those trips, gambled. Furthermore, when confronted with this theft by the Archdiocese, defendant denied having any gambling addiction and stated she stole the money because she believe she deserved it. (Kumar Decl. Ex. D.)

### C. The Need to Reflect the Seriousness of the Crime, Promote Respect for the Law, Provide Just Punishment, Protect the Public from Further Crimes by Defendant, and Avoid Unwarranted Sentencing Disparities

In addition to the factors set forth above, the government's request also rests on the need to provide just punishment, promote respect for the law, and avoid unwarranted sentencing disparities. Put plainly, a crime this serious requires punishment. While the Order has restricted defendant's movements as a result of her conduct, that punishment was not meted out by the justice system. Much like debarment, loss of professional licenses, and loss of reputation, this is a collateral consequence of defendant's own conduct. This consequence could cease at any point should defendant walk away from the Order. Defendant has not been punished by the criminal justice system and such a punishment is essential to ensure that defendant understands the severity of her crimes and so others are adequately deterred by this sentence.

Avoiding the risk of unwarranted sentencing disparities is also particularly relevant here. Any defendant who stole nearly $1

million from a children's school would and should get prison time. Indeed, as a 12-year old student of St. James wrote "[s]he is just like any other robber." (Kumar Decl. Ex. I.)  To allow this defendant to escape liability entirely would be unjust and unwarranted.  Her age is mitigating and has been accounted for in the government's recommendation.  The lack of criminal history (which is shared by virtually every fraud defendant) has as well.  That this defendant is a nun does not, in the government's view, merit a further variance from the range because her status as a nun did not deter her from committing this offense and she likely escaped detection for many years because she was a nun.  It is imperative that our system treat all defendants equally unless disparate treatment is warranted.  Sentencing this defendant to the term requested by the government would send a strong message to the community that the Court takes these crimes seriously and that no matter who you are the system will appropriately punish you for your crimes.

**V.   RESTITUTION IS MANDATORY**

Restitution is mandatory pursuant to the Mandatory Victims Recovery Act ("MVRA").  18 U.S.C. § 3663A.  The goal of the MVRA "is to make the victim whole." United States v. Anderson, 741 F.3d 938, 951 (9th Cir. 2013).  This Court need only reasonably estimate a restitution amount, it need not be calculated with precision. United States v. Baker, 584 Fed. Appx. 469, 471 (9th Cir. 2014)("Speculation and rough justice are not permitted' when calculating restitution under the MVRA, but 'exact precision is not required and district courts have a degree of flexibility in accounting for the victim's complete losses; thus, a reasonable estimate will suffice.").

The parties agreed to a loss amount of $835,338.57 in the plea agreement and the USPO concurs with this amount.  To date, $10,000 has been returned to St. James School, (PSR ¶ 8 n.1), and, thus, the actual loss is $825,338.57.  This should be the amount of restitution ordered payable by defendant to St. James School.  The government would request that the judgment and commitment order include a provision that sets forth as follows:  "To the extent the victim receives compensation for this loss from another source, the amount of restitution owed to the victim will be correspondingly reduced by the amount of compensation received.  The compensating source will, pursuant to 18 U.S.C. § 3664(j)(1), then be owed restitution in the amount of compensation provided and the debt owed to this source will be secondary to the restitution to be paid to the primary victim."

**VI.   SUPERVISED RELEASE**

The government submits that a three-year term of supervised release is appropriate here.  Defendant requires supervision to ensure her compliance with the rules of society.  In addition, the government respectfully requests that the Court impose the following condition of supervised release, as agreed to by the parties:

> Defendant shall not work in any capacity, whether as a whole or partial owner, employee, volunteer, consultant, or otherwise, in any business that involves the management or control of funds, business accounts, brokerage accounts, and/or bank accounts of another.  Further, defendant shall provide the Probation Officer with access to any and all business records, client lists, and other records pertaining to the operation of any business owned, in whole or in part, by defendant, as directed by the Probation Officer.

11

(Plea Agreement ¶ 2(o).)

**VII. CONCLUSION**

    For the foregoing reasons, the government respectfully requests that this Court impose a sentence of 24 months of imprisonment, restitution in the amount of $825,338.57, a three-year term of supervised release, and special assessments of $200.